# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| REALTIME DATA LLC, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 6:16-CV-00961-RWS |
| | § | |
| v. | § | |
| | § | |
| NETAPP, INC., SOLIDFIRE, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant NetApp and SolidFire's (Collectively "NetApp") *Daubert* Motion to Exclude Testimony by Mr. Stephen Dell. (Doc. No. 234.) Plaintiff Realtime filed a Response (Doc. No. 244) and Sur-Reply, (Doc. No. 249), and NetApp filed a Reply. (Doc. No. 247.)

## BACKGROUND

Realtime alleges that NetApp infringes certain claims of six U.S. Patents. The Asserted Patents generally relate to different systems and methods of data compression. Specifically, Realtime alleges that NetApp's ONTAP software and products and services running ONTAP, AltaVault; and Solidfire compression products and services, including the SolidFire all-flash storage system products infringe the Asserted Claims of the Asserted Patents. (Doc. Nos. 33, 235-2 at ¶ 2 ("Dell's Rep.").)

Realtime has designated Mr. Stephen Dell as a Damages Expert in this matter. *Id.* Mr. Dell opines that Realtime is entitled to a reasonable royalty due to NetApp's sales of the Accused Products. Dell's Rep. ¶ 89. Mr. Dell found that there is "a functional relationship [] between the

1

Accused Products and services and maintenance offerings that are tied to sale of the Accused Products." *Id.*

## **LEGAL STANDARD**

Rule 702 provides that an expert witness may offer opinion testimony if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. FED. R. EVID. 702.

The Rules also "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 594, 597 (1993). "The relevance prong [of *Daubert*] requires the proponent [of the expert testimony] to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). "The reliability prong [of *Daubert*] mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis*, 174 F.3d at 668)).

In assessing the "reliability" of an expert's opinion, the trial court may consider a list of factors including: "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards," and "general acceptance" of a theory in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it

mentions do *not* constitute a 'definitive checklist or test.'"); *U.S. v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010). "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)). At base, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

## DISCUSSION

Defendants move to exclude Mr. Dell's damages opinions on three bases: (1) Mr. Dell calculates the wrong royalty base by including non-patented software/hardware service and maintenance offerings; (2) Mr. Dell's apportionment analysis is speculative and unreliable; and (3) Mr. Dell's hypothetical negotiation is impermissibly immutable. (Doc. No. 234.)

### I. Dell's Calculation of the Royalty Base

NetApp argues that Mr. Dell calculated the wrong royalty base because the calculation "assumes a royalty base that encompasses both the accused products *and* NetApp's revenues from software/hardware service and maintenance offerings." (Doc. No. 234 at 4.) NetApp maintains that by including the convoyed sales of non-patented products, Mr. Dell must satisfy the three factors of the entire market value rule ("EMVR"). *Id.* Realtime argues that NetApp misstates the requirements because courts have allowed using convoyed sales of non-patented products for a royalty base calculation. (Doc. No. 244 at 1.)

In a reasonably royalty analysis, damages must be tied "to the claimed invention's footprint in the marketplace." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). Thus, "where multi-component products are involved, the governing rule is that the

ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)). When the accused products have both patented and non-patented features, the damages analysis requires an apportionment analysis in order to determine the value added by such features. To determine the royalty base, "the patentee should [] base[] its damages on 'the smallest salable infringing unit *with close relation to the claimed invention*." *VirnetX*, 767 F.3d at 1327 (citing *Cornell University v. Hewlett-Packard Co.*, 609 F.Supp.2d 279, 287–88 (N.D.NY. 2009)). "Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . the patentee must do more to estimate what portion of the value of the product is attributable to the patented technology. *Id.*

Defendant relies on *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) to show that convoyed sales cannot be included in the royalty base. However, the language in *Rite-Hite* is ambiguous as to whether it is improper to consider convoyed sales in calculating the royalty base. *See* 56 F.3d at 1549. The case addresses the question of whether collateral sales may be considered in a lost profits calculation based on the entire market value rule. *Id.* at 1549 n. 9. A footnote only states that "[the] issue of royalty base is not to be confused with the relevance of anticipated collateral sales to the determination of a reasonable royalty rate." *Id.* (citing *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1559 (Fed. Cir. 1983).

Conversely, the two cases relied on by Plaintiff show that convoyed sales may be considered in calculating a royalty base. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed Cir. 2001); *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1373 (Fed. Cir.

4

2010). In *Interactive Pictures*, plaintiff's damages expert had computed this value by using projected future sales for all of defendant's products as the royalty base, even though only a subset of defendant's products were accused of infringement. 274 F.3d at 1384. Plaintiff argued that even though not all of defendant's products infringed the asserted patents, the accused products were bundled with sales of defendant's other products and drove the overall sales of defendant's products. *Id.* On that basis, plaintiff argued that it was proper for the royalty base to account for projected revenue from all of defendant's products. *Id.* The Federal Circuit agreed, stating that plaintiff's damages expert:

> permissibly included all Infinite products in the royalty base, and that [plaintiff's expert] did not provide for an unfair double recovery by factoring the bundling and convoying sales into the royalty rate. The jury was entitled to rely on evidence of bundling and convoyed sales in determining the proper scope of the royalty base.

*Id.* at 1385 (citing *Deere & Co.*, 710 F.2d at 1559). In *Fujifilm*, the Federal Circuit cited *Interactive Pictures* and agreed that the jury was entitled to rely on evidence of bundling and convoyed sales in determining the royalty base. 605 F.3d at 1372–73. The Federal Circuit in *Fujifilm* upheld a jury's damages award which included a royalty rate of $2.00 per infringing product. *Id.* Plaintiff's expert opined that "in a hypothetical negotiation the royalty rate would have changed inversely to the royalty-base changes, resulting in a consistent royalty amount." *Id.* at 1372. In other words, plaintiff's expert provided an example where convoyed sales were included in the royalty base, but the royalty rate was lower and an example where convoyed sales were not included in the royalty base, but were considered in reaching a higher royalty rate. *Id.* at 1372–73. The explicit statements in these two cases govern here. Both the cases specifically dealt with the issue of whether it was proper to include convoyed sales in both the royalty base and rate.

5

However, this analysis does not end the inquiry. In the context of the entire market value rule, the Federal Circuit has cautioned against the prejudicial impact that a large royalty base may have on the jury. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) (the disclosure of the full product revenue for an allegedly infringing product "cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."). In order to safeguard against this concern, as well as meet the admissibility standards prescribed by *Daubert*, an expert who wishes to include convoyed sales in a royalty base must at least "present a clear explanation of 1) why and how the purported convoyed sales are tied to the sales of the accused products and 2) what value of the royalty base is attributable to the accused products themselves versus the convoyed sales." *See Realtime Data, LLC v. Actian Corp. et al.*, No. 6:15-cv-463, 2017 WL 1513098, at *1 (E.D. Tex. April 27, 2017). Further, as the Federal Circuit explained in *Rite-Hite*, "[the] issue of royalty base is not to be confused with the relevance of anticipated collateral sales to the determination of a reasonable royalty rate." *Rite-Hite*, 56 F.3d at 1549 n.9. In other words, it is not appropriate to adjust the royalty base due to collateral sales in the midst of the *Georgia-Pacific* analysis—any consideration of collateral sales in this context should be related to the adjustment of the royalty rate. And again, in adjusting the royalty rate due to collateral sales, the analysis should likewise be clear as to why and how the expert believes the collateral sales are tied to the sales of the accused products, and how this connection impacts the royalty rate. With these conditions met, it may be appropriate to include convoyed sales in the consideration of both the royalty base and rate. *See, e.g.*, *Fujifilm*, 605 F.3d at 1372–73.

In this case, Mr. Dell stated he understood the "combination of hardware and software comprising the accused systems must function together." Dell's Rep. ¶ 77. Mr. Dell relied on

the fact that NetApp provides its software and related hardware appliances "to the market as an 'engineered system to manage customers' data." *Id.* at ¶ 76. Mr. Dell also relied on NetApp's Vice President and General Manager of SolidFire, Daniel Berg, who indicated "software is not of much value unless it runs on a piece of hardware, so we sold [SolidFire] as [an] appliance, the combination of hardware and software." *Id.* Mr. Dell also relied on NetApp's Vice President of Product Management who stated that the hardware appliances on ONTAP are only capable of running ONTAP and not any other file system software. *Id.* Because of this, Mr. Dell concluded that "the Accused Products (i.e., the accused software and accused hardware products identified above) represent the smallest saleable patent practicing unit ("SSPPU") asserted to infringe the patents-in-suit." *Id.*

Mr. Dell went on in his analysis to assess the functional relationship between the services and maintenance offerings and the Accused Products "to determine if such sales are convoyed sales or sold only for business convenience." *Id.* at ¶ 87. Mr. Dell noted that the maintenance offerings were intended to "provide customers with bug fixes, patches and support for software, as well as hardware maintenance and warranties directly related to the products purchased, *i.e.*, the Accused Products." *Id.* Further, Mr. Dell found the offerings "are sold 'bundled' with certain product offerings and in many cases are *required* to be purchased in conjunction with the Accused Products." *Id.* (emphasis in original). Mr. Dell noted that the "service and maintenance offerings are not sold on a stand-alone basis from the Accused Products and have no intended purpose separate and apart from the Accused Products." *Id.* at ¶ 88. Based on these factors, Mr. Dell stated:

> "I am unaware of any reason why NetApp's customers would purchase service and maintenance offerings for the Accused Products without also purchasing the Accused Product. As a result, this evidence demonstrates that demand for the

> Accused Products forms the basis of customer demand for the related service and maintenance offerings attributed to the Accused Products."

*Id.* Overall, Mr. Dell decided that the "revenues generated from the sale of service and maintenance services constitute convoyed sales that should also be included in the royalty base in this case." *Id.* at ¶ 90.

Through the above analysis, Mr. Dell specifically explains the basis for considering certain NetApp services as convoyed sales. *Realtime Data*, 2017 WL 1513098 at *1. He then apportioned the value of the royalty base attributed to the accused products themselves versus the convoyed sales. Dell's Rep. ¶¶ 101–26 (analyzing the percentage of financial benefit in each product and determining the appropriate apportionment); *see id.* Because Mr. Dell "present[ed] a clear explanation of 1) why and how the purported convoyed sales are tied to the sales of the accused products and 2) what value of the royalty base is attributable to the accused products themselves versus the convoyed sales," Mr. Dell's analysis of the different convoyed sales in his royalty base and apportionment analysis is not inherently unreliable. *Realtime Data*, 2017 WL 1513098 at *1. Although NetApp argues there are other features driving demand for the accused products "including many that rank higher than deduplication and compression" in customer support questions, (Doc. No. 234 at 5) that goes to the weight of the testimony and opinion, not on its admissibility. *See* FED. R. EVID. 702 Advisory Committee's Notes, 2000 Amendments (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

## II. Dell's Apportionment Analysis

NetApp argues that the methodology Mr. Dell used in his apportionment analysis is improper. (Doc. 234 at 7.) NetApp states that Mr. Dell (1) fails to tie his apportionment factor to the particular features of each accused product and (2) improperly relies on comparable licenses to determine the apportionment rate for the products in this litigation. *Id.* at 8–11.

8

Realtime argues that Mr. Dell's apportionment analysis is methodologically sound due to his analysis of the documents, testing, and licensing history to isolate the incremental value from the patented compression functionality; his application of the factor to each accused product; and his reliance on comparable licenses. (Doc. No. 244 at 8–14.)

NetApp maintains that Mr. Dell only found an apportionment factor of 25% without explaining any variance in the products, the differing features, or what created a split of 25/75%. (Doc. No. 234 at 9.) However, Mr. Dell relies on information on the individual products and the expert report of Dr. Wesel to come to the conclusion that each of the products have an apportionment factor of 25%. Throughout his report Mr. Dell specifies the differentiating factors of the products and comes to the conclusion that the accused products each provide "direct cost savings due to the ability to store more data with less overall storage capacity." Dell Rep. ¶ 52–60, 74. Mr. Dell relied on the fact that each of the products used similar NetApp storage devices to run similar software. *Id.* ¶¶ 52–66. Mr. Dell also relies on Dr. Wesel's reports and figures in each of the products to show "customers will rely upon deduplication . . . [which] *will* provide additional storage savings over the use of only compression by itself." *Id.* at ¶ 116. Mr. Dell noted that Dr. Wesel's report showed storage efficiencies ranging between 22% and 32.8% with an average efficiency gain of approximately 28%. *Id.* at ¶ 119. Mr. Dell relied on the license agreements produced by Realtime in other cases to show apportionment factors ranging between 25% and 33%. *Id.* at ¶ 120. Mr. Dell determined "that apportionment factors ranging broadly between 20% and 50% are appropriate in this case" and therefore determined "an apportionment factor of 25% would be considered a fair and reasonable apportionment factor used by the parties to determine the revenue base that is directly tied to the economic benefits attributable to the

patents-in-suit." *Id.* at ¶¶ 121, 123. Based on the presented data, Mr. Dell did look at the differences in each product and concluded that 25% was fair for each product.

NetApp also argues that it was inappropriate for Mr. Dell to rely on prior license agreements for his analysis and use the prior licenses as a "rule of thumb." (Doc. No. 234 at 10–11.) Licenses may be presented to the jury to help the jury decide an appropriate royalty rate. *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (internal citation omitted). "Prior licenses, however, are almost never perfectly analogous to the infringement action." *Id.* License may cover more patents than those at issues, involve foreign intellectual property rights, or calculate as some percentage of the value of a multi-component product. *Id.* "Testimony relying on licenses must account for such distinguishing facts when invoking them to value the patented invention." *Id.*; *see ResQNet*, 594 F.3d at 869 (improper to rely on a license with no relationship to the claimed invention); *VirnetX*, 767 F.3d at 1330 (allowing an expert to rely on six challenged licenses because four related to the patents-in-suit and others were drawn to a related jury, and the jury was allowed to evaluate the relevance of the licenses). However, the fact that a license is not perfectly analogous "generally goes to the weight of the evidence, not its admissibility. *Id.* (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014)). The court "must assess the extent to which the proffered testimony, evidence, and arguments would skew unfairly the jury's ability to apportion the damages to account only for the value attributable to the infringing features." *Id.*

In Mr. Dell's report, he analyzes former license agreements "involving the patents-in-suit or other patents owned by Realtime." Dell Rep. ¶ 134. He then:

> "analyzed and considered the various similarities and differences that may exist between these licenses and that of the hypothetical negotiation in this case, including similarities/differences in the factors or circumstances leading to the license, the accused products and the importance of the asserted patents to the

accused products and the importance of the asserted patents to the accused products, the number and similarity of patents licensed, the parties to the license, as well as other extrinsic factors such as litigation risk, relevant industry, and financial condition of the parties[.]"

*Id.* Mr. Dell proceeded to analyze each of the license agreements with which patents they tied to, the agreed upon royalty rate, the apportioned value, and the lump sum paid. *Id.* ¶¶ 137–76. Mr. Dell noted when the prior license agreements correlated directly to the patents-in-suit, and where the license agreements had at least one of the patents-in-suit and noted these agreements provided "further insight into Realtime's licensing practices and the economic considerations[.]" *Id.* at ¶ 152. Mr. Dell asserted that it was the patents now asserted against NetApp that "drove the value of the licensing negations" in three of the agreements he relied on. *Id.* at ¶ 177. Further, Mr. Dell relied on a discussion with Realtime's vice president to find that the apportionment methodology was comparable. *Id.* at ¶ 149. Based on his review, Mr. Dell found that royalty rates ranged "from 3% to 10% of apportioned accused revenue for the relevant license period[.]" *Id.* at ¶ 176. He also found the "apportionment factors rang[ed] between 25% and 50%[.]" *Id.* Because Mr. Dell utilized prior license agreements that use the same patents-in-suit, and because he compared NetApp's technological differences, his consideration of comparable licenses to the patents-in-suit to apportion was not an unreliable methodology. *See LaserDynamics, Inc. v. Quanta Computer Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (citing *ResQNet*, 594 F.3d at 869) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patents rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace").

### III. Dell's Hypothetical Negotiation

NetApp argues that Dell's hypothetical negotiation is immutable because Mr. Dell over-generalizes the bargaining power of the NetApp and SolidFire and over-generalized that the

same conclusion would happen in 2010, 2012, 2014, or 2015. (Doc. No. 234 at 12.) NetApp argues that the market changed and both companies changed over the years, and this analysis confirms he used a "rule of thumb" analysis. *Id.* Realtime maintains that Mr. Dell looked at the different hypothetical negotiation dates and found the outcome did not materially change. (Doc. No. 244 at 15.) Realtime states that the market would increase over time and the accused products would be commercially successful. *Id.* Realtime argues that Mr. Dell looked at the fact that SolidFire was not acquired until 2015, but found the royalty outcome would not change. *Id.*

Mr. Dell notes that he was told to consider a hypothetical negotiation date at different times. Dell. Rep. ¶ 132, 266. Mr. Dell determined that certain factors "such as the timing of the license agreements entered in to in this case, as well as the continued importance and introduction of additional compression and deduplication features in the Accused Products, may provide additional factors for the parties to consider in negotiating the terms of the hypothetical license." *Id.* at ¶ 132. He found NetApp "has continued to add additional compression and deduplication algorithms to each successive product release" and therefore the range negotiated apportionment range would receive upward pressure. *Id.* at ¶ 266. Based on this he found there would be no significant change in the hypothetical negotiation. *Id.* Because he did consider various factors, his statements were not over-generalized and the court finds his testimony admissible.

Further, Mr. Dell notes in his supplemental report that he considered different factors in the negotiation between Realtime and SolidFire before it was acquired. (Doc. No. 244-6 at ¶ 5.) Mr. Dell concluded "[t]he hypothetical negotiation between Realtime and SolidFire would result in the same 25% apportionment factor and 3.75% royalty rate that would be utilized in calculating the lump sum payment calculation." *Id.* Because Mr. Dell did consider SolidFire's

12

position before NetApp acquired it, he did not over-generalize his findings and did not apply a "rule of thumb" analysis.

## **CONCLUSION**

For the reasons stated herein, the Court **DENIES** Defendant's Motion to Exclude Testimony by Stephen Dell. (Doc. No. 234.)

**So ORDERED and SIGNED this 16th day of November, 2017.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE